[Civ. No. 28946. Second Dist., Div. Three. Feb. 10, 1967.]

JOSEPH E. WHITLOW, Plaintiff and Appellant, v. THE BOARD OF MEDICAL EXAMINERS et al., Defendants and Respondents.

Samuel L. Kurland and William R. Ives for Plaintiff and Appellant.

Thomas C. Lynch, Attorney General, and Leonard Goldstein, Deputy Attorney General, for Defendants and Respondents.

SHINN, J.*—The appeal is from a judgment denying a petition of Joseph E. Whitlow for a writ of mandate annulling an order of the State Board of Medical Examiners suspending appellant's certificate for the practice of medicine and surgery. The order placed appellant on probation for five years, one of the conditions of probation being that appellant desist from the practice of medicine and surgery for 180 days. Execution of the order of suspension has been stayed pending the determination of the instant proceeding.

On January 28, 1963, invoking the authority of the board to revoke or suspend certificates of licensees for unprofessional conduct conferred by sections 2360 and 2361 of the Business and Professions Code, the executive secretary of the board filed an accusation against appellant of unprofessional conduct in the issuance of prescriptions for dangerous drugs in violation of section 2399.5 of the Business and Professions Code, which at that time defined as unprofessional conduct the issuance of prescriptions for dangerous drugs "without either prior examination of the patient or medical indication thereof." (In 1965 the word "therefor" was substituted in place of the word "thereof".)

It was alleged in the accusation that between February 23d and July 17th of 1962 appellant prescribed separately 30 and 100 tablets of Pentobarbital for D. A. Lyons, for Jack Berg 100 tablets of Dilantin and separate prescriptions on separate occasions of 200 and 300 tablets of Seconal and 100 tablets of Percodan; for Sandra Frank on each of five separate occasions 100 tablets of Seconal; for Gene Ashton on each of three occasions 100 tablets of Seconal; for Vicki Popov 100 tablets of Seconal; for Ginny Johnson 100 tablets of Seconal; for Edward A. Rogers 100 tablets of Seconal and for Archie Allen 23 prescriptions amounting to 1170 tablets of Doriden. The true names of Gene Ashton, Vicki Popov and Ginny Johnson were respectively Eugene Dague, Vicki Ammons and Virginia Johnson.

In due time a hearing was had before a hearing officer. At the time of the commencement of the hearing, upon motion of the Attorney General, the charges relating to Jack Berg were

*Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

dismissed. At the conclusion of the evidence the hearing officer made and filed findings and a proposed decision. It was found that as to Lyons there was medical indication sufficient to warrant the issuance of the prescriptions to him; that as to Rogers it was not established by a preponderance of the evidence that the prescriptions were given without medical indication sufficient to warrant issuance of the prescriptions; that as to Allen it was shown that he was suffering from a condition which furnished medical indication sufficient to support the issuance of the prescriptions to him, but that the quantity of the same was not in issue, and no finding was made thereon. It was found that as to Sandra Frank, Ashton, Popov and Johnson appellant had prescribed dangerous drugs without prior examination of the persons and without medical indication thereof as charged in the accusation. For convenience we shall refer to these four persons as patients of appellant. It was found that the acts of appellant constituted unprofessional conduct as defined by section 2399.5 of the code and were cause for disciplinary action pursuant to setion 2360 of the code. The proposed decision of the hearing officer was that the certificate of appellant be revoked but that execution of the order be stayed and appellant be placed on probation for a period of five years upon conditions, one of which being that for a period of 180 days appellant not exercise any of the privileges of his certificate. The findings and the recommended decision of the hearing officer were adopted by the board as a basis for the order which was entered in accordance therewith. The four persons last named were witnesses in the hearing and appellant testified in his own behalf. In the court trial the complete record of the proceedings before the board was received in evidence and the court ruled that no other evidence would be received. In the trial of the petition for mandate the court made findings corresponding with those of the board.

We consider first the contention of appellant that section 2399.5 is confusing, probably meaningless and therefore unenforceable. Appellant says ''the meaning of the language 'or medical indication thereof' following 'prior examination' cannot be ascertained.'' This criticism of the language of the section and its meaning was decided adversely to the contention of appellant in *Sunseri* v. *Board of Medical Examiners*, 224 Cal.App.2d 309, 313 [36 Cal.Rptr. 553], in which it was said: ''Nor do we find any fatal ambiguity in that part of the statute which, in reference to prescribing dangerous drugs,

uses the language 'or medical indication thereof.' One definition of the word 'indication' is a symptom or particular circumstance that indicates the advisability or necessity of.' (Webster's Third New International Dictionary.) Another definition is: 'That which serves to indicate or point out; sign.' (Webster's New Collegiate Dictionary (2d ed.).) ▮ It seems plain that the phrase 'medical indication' as used in the statute simply means the existence of symptoms or the presence of satisfying evidence which suggests to a doctor the need or advisability for prescribing the use of a dangerous drug. ▮ We think the language used in the statute is sufficiently definite to provide a satisfactory standard of conduct for the medical profession whose activities it is designed to regulate, and that it is not subject to the constitutional attack leveled at it by appellant. (*Lorenson* v. *Superior Court*, 35 Cal.2d 49, 60 [216 P.2d 859]; *People* v. *Ring*, 26 Cal.App.2d Supp. 768, 771-772 [70 P.2d 281].)'' Moreover, as we shall see, Dr. Whitlow did not act or refrain from acting under a misunderstanding of the nature of his professional duties in issuing prescriptions for dangerous drugs.

The next contention to be considered is that the findings of the board and the court do not support the judgment.

The court found that the hearing officer found that the petitioner prescribed Seconal for Sandra Frank on five occasions, for Eugene Dague on three occasions, for Vicki Ammons on one occasion and for Virginia Johnson on one occasion without a prior examination of said persons for whom he was prescribing and without medical indication thereof. The court also found ''the Order and Decision of the Board is supported by its Findings; each and all of its Findings are supported by competent evidence and by the weight of that evidence.'' The court also found: ''That each of the Prescriptions found to have been issued by Petitioner by the Finding of Respondent was issued and sold by Petitioner to each person without any medical examination or medical indication of the need thereof, and with knowledge that the said drugs thus prescribed were not reasonably necessary to the health of the person for whom it was prescribed nor to the treatment of any morbidity.

''That Petitioner did, after becoming aware that said persons for whom he prescribed and issued the Prescriptions for said Seconal were sent to him by Respondent and that Disciplinary Proceedings would be taken by Respondent, willfully prepare false medical records of and as to the said

persons, found in the said Findings, for whom he did prescribe said Seconal.''

Appellant refers to findings that each of the four persons was sent to him for the purpose of determining whether he would issue prescriptions for Seconal or narcotics; that appellant in each instance observed, talked to and met with each of said persons; appellant believed and relied upon the statements made by each of said persons at the time of their visits and that the prescriptions in each instance were issued in form required by law, and appellant then says ''it is impossible to ascertain how the hearing officer or the court could have found that the prescriptions were issued without medical indication thereof.'' The findings quoted above are specific as to the actions of appellant which constituted the unprofessional conduct charged. They fully support the order of the board and the judgment.

The next contention is that there was insufficient evidence that appellant was remiss in the performance of his duties before he issued the prescriptions. We consider this contention under the rules applicable to the functions of the trial court and of this court upon appeal. It was the duty of the trial court to make its own independent determination and findings of the material facts; our duty is to determine whether the facts found by the trial court have sufficient support in the evidence. (*Moran* v. *Board of Medical Examiners*, 32 Cal.2d 301 [196 P.2d 20].)

Appellant is a general practitioner practicing in the City of Ventura in Ventura County; Sandra Frank was a part-time employee of the board as an investigator; in that capacity she was active and industrious, having already investigated 20 or 25 cases in a year and a half; she was paid on a per case basis; Eugene Dague was a senior special investigator for the state; Vicki Ammons and Virginia Johnson were secretaries in the office of the District Attorney of Ventura County; Lyons was an investigator for the Department of Professional Standards.

It is the contention of appellant that from mere observation he could and did detect in the patients nervousness, restlessness, and other conditions requiring sedation; that there was no contrary evidence and it is argued that there was uncontradicted testimony of appellant that he did ascertain that, as to each of his patients, there was medical indication justifying the use of Seconal. The record does not bear out these contentions.

■ Sandra Frank first visited appellant June 21, 1962, in the company of L. A. Lyons; appellant asked Sandra what she wanted and Sandra said she wanted to get some pills; appellant asked what kind and Sandra replied ''Seconal.'' Sandra did not complain of ill health or inform appellant of any symptoms nor did she feign ill health. She testified that she was in good health and that she informed appellant of that fact. When appellant reached for his blood pressure gauge Sandra told him there was nothing wrong with her, that she felt fine; appellant asked ''You feel all right?'' and she answered ''Yes, I am fine.'' Appellant asked why she wanted the pills and she replied: ''Some people smoke, some people drink,'' and appellant looked at her and said ''And you take pills?'' and she replied ''Yes.'' Thereupon appellant gave Sandra a prescription for 100 Seconal tablets for which he charged her $5. June 28, 1962 Sandra returned with Eugene Dague who gave the name of Ashton. Without examination or discussion of the health of Sandra appellant gave her another prescription for 100 Seconal tablets for a charge of $5. July 24, 1962 Sandra returned with Dague; appellant gave Sandra the usual prescription of 100 tablets for which she paid $5. Sandra said Dague wanted a prescription and Dague said he would like the same as Sandra had been getting. There was no medical examination nor inquiry as to the health of Dague but appellant gave him a prescription for 100 Seconal tablets for which he paid $5. August 9, 1962 Sandra came back with Vicki Ammons who used the name of Popov; no examination of either woman was made; Sandra said she was ''all right.'' She was in good health and made no complaint of illness. Appellant offered to make a blood pressure test of Vicki and she said she felt fine; Sandra remarked that Vicki was ''as healthy as a cow.'' Vicki said that she had been taking some of Sandra's pills and would like to have a prescription for the same; when asked why she wanted them Vicki replied that she wanted them for ''kicks.'' Upon this occasion Sandra asked for a prescription for Ashton, who was not present, and appellant issued a prescription for Ashton and gave it to Sandra; $5 was paid for each prescription. August 30, 1962, Sandra brought Ginny Johnson to appellant; Ginny sat on the arm of Sandra's chair; appellant asked what he could do for her and she said she wanted the same thing as Sandra. There was no examination and no questioning of either woman but each was given a prescription for 100 Seconal tablets and appellant was paid $10. September

4th appellant gave Dague a prescription for 100 Seconal tablets without an examination or inquiry to ascertain whether he was in need of them. Dague testified that appellant said to him and Sandra "Now I am kind of worried about you kids. You have got to have some reason for this sort of prescription. You have to have either nerves, sleeplessness, or something." Sandra said, "You usually put down nerves on it. That always passes." and appellant said "Yes, because it doesn't look good on the record without some complaint."

Appellant placed upon his records data as to the temperature, pulse, respiration, and blood pressure of the patients as of the times of their various visits. No such tests had been made. Appellant's explanation was that he made the entries later to fill in the records and that while he had not made any of the tests, the data he recorded would be those of normal persons. None of the entries so made indicated any illness of the patients or any need for the drugs.

Appellant testified to the circumstances in which he issued each of the prescriptions. There is no necessity for an extended statement of the explanation he gave. It did not differ in substance from the testimony of the other witnesses. He testified that he observed the appearance and manners of the patients. Sandra was always loquacious, jabbering and constantly laughing. He did not inquire of them whether they were ill; he merely observed what appeared to be nervousness and restlessness in their actions; he considered the actions he had observed and issued the prescriptions because in his judgment Seconal could do them no harm and might be beneficial. Seconal in his opinion was proper medication for nervousness, worry and sleeplessness. He refused to give Sandra a prescription for a narcotic, and did not prescribe narcotics or have anything to do with them.

The findings which were adverse to appellant can only mean that the finders of fact believed that appellant did not make a sincere and honest effort to determine whether the conditions of the several patients were such as to reasonably require the treatment which he prescribed. It is all too clear that Sandra had gained the confidence of appellant and that he was more concerned with pleasing her by prescribing for her and her friends than in rendering them any needed medical service.

The additions which appellant made to his records to show examinations which he had not made led the court to believe that appellant was conscious of the inadequacy of his efforts

to ascertain the state of health of the patients and the insufficiency of the information obtained to give legality to the favors he had done for them, and greatly weakened his credibility.

Appellant maintains that he was found guilty by the trial judge of wrongful conduct of which he was not accused, namely, of making false entries in his records to show he had made examinations of the patients when no examinations had been made. This contention is not based upon any finding or conclusion of the court, but upon remarks made by the judge in stating his reasons for the tentative conclusions he had reached. In brief, the court stated that the decisive question was the good faith of the doctor, and that the court would have found him guiltless had it not been that he made false entries respecting examinations. Copies of some of the records were brought to light during the cross-examination of the doctor. He stated they were made for his own use and, perhaps, after he had received notice of the accusation. The court viewed this action as the preparation of false evidence which so affected the doctor's credibility as to taint his entire testimony and cast serious doubt upon his good faith. That was one way of looking at the matter. Upon the other hand, there was no evidence that the doctor ever intended to use the records as evidence that he had made the examinations as indicated. In fact we are at a loss to understand why he made the false additions. The records in question were placed in evidence and we have examined those relating to several of the patients. As the doctor interviewed the patients he made notes. There were entries on the card of Ginny Johnson August 30th "Diagnosis (1) Insomnia & (2) Anxiety neurosis, Extreme nervousness, Sleeplessness." On the card of Vicki Popov August 9th were entries "nerves & sleeplessness. Diagnosis (1) Anxiety neurosis & Sleeplessness. Insomnia. Extreme nervousness & anxiety." On the card of Ashton, September 4th, 1962, were entries "Very nervous and unable to relax or sleep without a hypnotic. Appears jittery and frequently changes body position. . . . Diagnosis Insomnia & anxiety neurosis." Two other cards of Ashton's were quite similar. The card of Sandra Frank of August 30th had entries "Nervous-sleepless. Jittery, fidgety, nervous high strung. Needs sedation. Needs to sleep. Diagnosis Insomnia, anxiety. Sandra Frank asked for Dolophine Rx. Rx No Sale. N.C. No. Rx." Sandra's cards of July 24th, July 28th and June 21st were all about the same as the one of August 30th except for the request for Dolophine.

We have no idea what the doctor had in mind when he made the additions. The witnesses testified that the doctor was making notes during the interviews and it is not questioned that he was making the above-mentioned entries. He testified the additions were solely for his own use, but this leaves us in the dark. The notations made during the interviews were all appellant could have needed; they were clearly sufficient to justify the prescribed medication. The additions respecting examinations not only failed to add any reasons for the medication but they indicated that the patients were quite healthy. We attach little sginificance to the additions that were made to the cards by the doctor and even less to the thinking aloud of the trial judge. Fortunately for the stability of judgments the findings of the court are those expressed in writing. What the judge said may be useful to explain the findings but it cannot overcome them, and if contradictory, must be disregarded. The court found that the symptoms, complaints and appearances which were entered on the cards during the interviews to indicate the need for sedation were not true entries of what had been heard and observed by the doctor. This was a reasonable conclusion from the testimony of the patients and the casual manner in which the doctor conducted the interviews. Unless we can say, as a matter of law, that the doctor could and did form an honest and good faith professional opinion in each instance that the patients had medical need for the drug and that it was prescribed for that reason, we must accept the findings as conclusive. Those were factual questions. The question of law is whether the findings had support in the evidence. There was clearly sufficient evidence to support the findings of the board and those of the court.

Another contention is that appellant was deprived of a fair trial by the conduct of the Attorney General consisting of objections during the cross-examination of Sandra and during the examination of the witnesses for appellant on the grounds that the questions were leading and suggestive and assumed facts not in evidence. It is argued that the Attorney General completely dominated the hearing officer and materially influenced his decision. It is clear that there was considerable misconception on the part of the Attorney General and the hearing officer as to the latitude permitted in cross-examination. The record also discloses a multitude of interruptions and arguments by the Attorney General which were uncalled for and certainly distracting. The hearing officer could have

maintained better control of the proceeding. However, counsel for appellant did not give up, and he succeeded in conducting thorough cross-examination of the witnesses for the board and in the presentation of the evidence of appellant. We cannot believe that the hearing officer was dominated by the Attorney General. His findings were in favor of appellant in each instance in which it appeared that appellant had formed a considered opinion that there existed medical indication of need for the drug that was prescribed.

It is also contended that a witness, King, an investigator for the district attorney, was permitted to give hearsay testimony. King sat in a car listening to transmissions from electronic equipment carried on the persons or in the effects of the several witnesses while they were in the doctor's office. King caused transcripts to be made of recordings of conversations on August 9th, August 30th and September 4th and these were received in evidence. ■ He produced what purported to be a transcript of a conversation he heard June 21st when Lyons and Sandra were in the doctor's office. Only about 60 percent of the transmission was intelligible and King completed a transcript from his recollection. He was asked by the Attorney General to make use of the transcript and to relate the conversation he had heard. It was apparent to defense counsel that in preparing the transcript King had added descriptions of the movements of the persons in the office which he could not have observed from his position in the car. Objection was made that the testimony would be based in part upon a transmission of a conversation that was to a great extent unintelligible and that it would include statements that could not have been within the personal knowledge of King. The objection was overruled and, using the transcript, the witness testified to facts of which he could have had no personal knowledge and to what he had added to the transcript from memory. This is the hearsay testimony which appellant contends was erroneously admitted. The objection was to the entirety of the testimony sought to be elicited from the witness, not merely to the parts which would be hearsay. In overruling the objection the hearing officer stated correctly that the objection went to the weight of the testimony, rather than to its admissibility. We need not discuss the rule that in administrative hearings more freedom in the receipt of evidence is permitted than in court trials. The facts to which King testified were also in evidence through the testimony of the witnesses who had participated in the conversations. And

the testimony of King was not contradicted by appellant on the stand. The claim of error in the admission of King's testimony is not sustained.

■ A further contention is that the procedure prescribed by sections 11513, 11517, 11518, 11519 and 11521 of the Government Code, under which the instant proceedings were conducted, is violative of appellant's rights under the California Constitution and the Fourteenth Amendment of the United States Constitution. Appellant insists that he had a constitutional right to a trial de novo as if the issues had never been determined by the board. He does not question that the procedure followed was that prescribed by *Dare* v. *Board of Medical Examiners*, 21 Cal.2d 790 [136 P.2d 304], approved in later cases. Manifestly, we cannot agree with this claim of unconstitutionality. It is also urged that appellant was denied due process for the reason that "A board investigates, signs a complaint, furnishes the witnesses and hears the case through a civil service hearing officer," and that "it does not hear the evidence or read the transcript or even obtain a summary of the evidence" and hence "can make no informed decision based on professional experience and the evidence." Nevertheless, says appellant, "the findings of the board come before the court with a strong presumption of correctness," (as held in *Dare*). These arguments were considered in *Cooper* v. *State Board of Medical Examiners*, 35 Cal.2d 242 [217 P.2d 630, 18 A.L.R.2d 593], and were decided contrary to the contentions of appellant. There was no deprivation of due process in this respect.

Appellant also contends that he was entrapped by the agents of the board into issuing the prescriptions. We do not believe that the facts found by the board and the court sustain this defense as a matter of law. The witnesses Lyons, Frank and Dague were acting as agents of the board, as previously stated; Sandra enlisted the assistance of Ammons and Johnson. The purpose of these witnesses was to obtain prescriptions for drugs. Sandra endeavored to obtain a prescription for Dolophine, a narcotic, but the others sought only prescriptions for Seconal.

■ It should be noted that the issuance of the prescriptions was not of itself in violation of section 2399.5; the unprofessional conduct charged was their issuance without an examination or medical indication of need for the drug. There is therefore a fundamental difference between the acts charged against appellant and the acts proved in the cases in which a

sale or giving away of a dangerous drug or narcotic was, in itself, a crime. The claim of entrapment poses the questions whether the four patients were the procuring cause of appellant's failure to make examinations or to use other means to ascertain whether there was medical indication of conditions which would justify administration of Seconal, and whether appellant was willing to prescribe the drug without evidence there was need for it. The witnesses testified severally that they were in good health, that they made no complaint of ill health and did not by conduct feign conditions which would indicate any medical need for the drug. It is true that Sandra admitted she was given to laughter, and that she did not deny the testimony of appellant as to her loquacity, but she substantially denied that she had put on an act for the purpose of deceiving the doctor. The witnesses Ammons and Johnson testified that they went to appellant's office at the request of Sandra but they denied that they had been coached by her to act in an unnatural manner in their interviews with appellant. In fact, they had been told not to pretend illness.

It has been stated over and over again that the defense of entrapment is not available to one who is shown to have been willing to commit an offense when given the opportunity.

There was, of course, a false representation that the witnesses intended to make personal use of the drug but this falsehood suggested the need for an examination or medical indication that Seconal would be proper treatment; it furnished no reason for appellant to prescribe the drug without ascertaining the medical need for it. The effective deception that was practiced upon appellant was the concealment of the fact that the pretended patients were state agents or assistants of the agents carrying recording equipment for the purpose of obtaining evidence to be used against him. The law does not concern itself with the morality or ethics of such trickery. Upon the contrary, it encourages and deems to be admirable the use by law enforcement agencies of methods in the apprehension of offenders which in the minds of all just men are considered dishonorable and abhorrent. Support for this statement will be found in the opinion in *People* v. *Braddock,* 41 Cal.2d 794 [264 P.2d 521]. Upon the facts proved it is clear that appellant was seduced in a truly professional manner but we cannot say as a matter of law that he was entrapped in a legal sense of that term.

It is also contended that the penalty imposed was so severe

as to amount to an abuse of discretion on the part of the board. One of the findings of the hearing officer reads as follows: "The respondent will be 66 years of age in August 1963. He attended the University of Michigan as an undergraduate, and received his medical degree from Loyola University in Chicago, in 1923. He was licensed to practice medicine in the State of California in August 1923. Dr. Whitlow served as an Assistant Medical Director of the State Compensation Insurance Fund, and in 1925 he entered private practice in the City of Fillmore, California, where he continued until 1941. Respondent was on the staff of the Los Angeles County General Hospital, and for a period of seven years devoted two days per week to charity work at that hospital. In 1941, the respondent was called to active duty with the United States Army Air Force. During this service, respondent served at various stations in the United States and overseas. The respondent saw service in India, China and Europe. In October 1945, the respondent was discharged with the rank of Lieutenant Colonel. Dr. Whitlow remained active in the Army Reserve and in 1955 was made Division Surgeon of the 65th Infantry Division. Following his return to civilian life, the respondent engaged in private practice in the City of Ventura. In total, the respondent has engaged in the practice of medicine for a period of 38 years." The court made a finding to the same general effect.

Much can be found in the record which speaks in favor of appellant. He is a general practitioner in Ventura, ministering to the people of this community at the rate of 25 to 30 per day. Many of his patients were charged by $1.00 per visit; others paid nothing. He bore an honorable record and as far as shown his reputation was without a blemish. He scorned the use of habit-forming drugs and refused to prescribe a narcotic for Sandra despite her pleading. He did not like for his friend Sandra and her friends to use Seconal and expressed himself as worried over their using it. But they wanted it and, as he testified, he thought it would do them no harm and might be helpful. It is easy to imagine that this elderly doctor who chose to make himself useful in a small community with little hope of fame or fortune would find it difficult to refuse the request of a friend, even against his better judgment. We cannot believe that either the board or the court failed to take into consideration the honorable character of the elderly doctor and his enviable career as a member of his profession.

The board has a broad discretion in the imposition of penalty and this must be exercised in accordance with the facts of the individual case. The choice rests between taking no real punitive action and imposing the extreme penalty of revocation of a license. The fact that the board chose the middle ground of suspension of the license for six months and five years probation indicates that it acted in the exercise of judgment and within the limits of its discretionary authority. We may be of the opinion that straight probation would have been a more appropriate penalty but the choice was within the powers and duties of the board and not those of the trial court, and it is not for this court to make the choice.

■ Learned counsel for appellant is fully conversant with the rule that the courts can interfere with the determination of penalty by an administrative body only when it is found to be an abuse of discretion. To that effect he cites *Morris* v. *Board of Medical Examiners,* 230 Cal.App.2d 704 [41 Cal.Rptr. 351] ; *Magit* v. *Board of Medical Examiners,* 57 Cal.2d 74 [17 Cal.Rptr. 488, 366 P.2d 816], and other cases.

Appellant argues that in *Magit* the Supreme Court, while stating the rule, departed from it and determined what the penalty should be. We do not so understand the opinion. The certificate of the accused physician had been revoked for permitting competent but unlicensed physicians to administer anaesthetics, a practice which was commonly followed by physicians and was generally believed to be legal and in accord with current court decisions. The physician had acted in good faith. The judgment was reversed and the matter was remanded for reconsideration of the penalty. The court's statement that probation would appear to be a proper punishment was not the fixing of the penalty but merely a reason for the holding that revocation was an abuse of discretion. *Morris* v. *Board of Medical Examiners, supra,* 230 Cal.App.2d 704; *Cooper* v. *State Board of Medical Examiners, supra,* 35 Cal.2d 242 and *Bonham* v. *McConnell,* 45 Cal.2d 304 [288 P.2d 502], cited by appellant, held only that the courts will annul and remand for reconsideration of the penalty provisions of an order which are found to be so out of proportion to the proved offense or breach of duty as to constitute an abuse of discretion.

Upon a consideration of the entire record and the claims of error we are unable to discover wherein appellant was deprived of a fair trial.

No doubt the court would have been justified in sustaining

the defense of entrapment. While there were no express findings of facts which would be determinative as to that defense the findings imply that the court found appellant was willing to prescribe dangerous drugs for his friends without complying with his professional duties imposed by law. This was an inference as to a fact which is conclusive on appeal unless we can say it was a manifestly unreasonable inference. We cannot say this and must hold that the defense of entrapment was not established as a matter of law.

The judgment is affirmed.

Ford, P. J., and Cobey, J., concurred.

A petition for a rehearing was denied March 6, 1967, and appellant's petition for a hearing by the Supreme Court was denied April 5, 1967. Mosk, J., did not participate therein.